UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA (RENO DIVISION)

**FRASER BUSHNIK,**

Plaintiff,

v.

**CAPCOM U.S.A., INC.,** and

**CAPCOM CO., LTD.**

Defendants.

Case No.: 3:26-CV-00053

**COMPLAINT FOR COPYRIGHT INFRINGEMENT**

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (copyright actions arising under federal law). This is a civil action for copyright infringement under 17 U.S.C. §§ 501–505.

2. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the infringing acts—distribution, sale, and public performance/display of the infringing work within *Street Fighter 6* downloadable content—occurs in this district. Defendants target Nevada residents

with nationwide online sales via platforms like Steam, PlayStation Store, Microsoft Store, and Nintendo eShop, accessible and purchased in Nevada.

**PARTIES**

3. Plaintiff Fraser Bushnik is an individual resident of Reno, Nevada, and owner/creator of the original animation work at issue. Plaintiff remains unemployed since the beginning of the timeline detailed by this case, coinciding with the developing and pitching of the work involved.

4. Defendant Capcom U.S.A., Inc. is a California corporation with its principal place of business at 185 Berry Street, Suite 4800, San Francisco, CA 94107, and is a wholly owned subsidiary of Defendant Capcom Co., Ltd. Defendant Capcom U.S.A., Inc. publishes, markets, and distributes video games in North America on behalf of Defendant Capcom Co., Ltd., including *Street Fighter 6*.

5. Defendant Capcom Co., Ltd. is a Japanese corporation with its principal place of business at 3-1-3 Uchihirano-machi, Chuo-ku, Osaka, 540-0037, Japan. Defendant Capcom Co., Ltd. develops, publishes, and distributes video games, including *Street Fighter 6*, and is the parent company overseeing the core development of the *Street Fighter* franchise.

**FACTUAL ALLEGATIONS**

6. Between February and August 2021, Plaintiff independently developed enhancements and modifications for Defendants' Unreal Engine 4 video game *Street Fighter V* (SF5). As an entrepreneurial effort to build a portfolio for potential employment or collaborative licensing

with Defendants—and to gauge online community interest—Plaintiff publicly posted completed demonstration videos on X (formerly Twitter) under the handle @Realguy001No. These demonstration videos and effort involved to modify SF5 included remaking and adding identifiable legacy "Super" attacks from earlier *Street Fighter* titles into SF5 characters, using Plaintiff's own artistic animation ability and gameplay design prowess, as well as designing a completely new move and novel animation sequence for the Street Fighter character M. Bison. Specifically, Plaintiff deprecated the V-Shift backdash mechanic; repurposed V-Shift Break counter-attack animations across characters into a new combo-oriented "V-Break" mechanic (using the V-Shift Break animation as its core); and innovated character-specific changes. For M. Bison, Plaintiff moved his commonly identifiable Psycho Crusher special move from V-Trigger 2 into the base moveset as the V-Break attack; repurposed Defendants' SF5 M. Bison V-Shift Break animation as the initial "hit" phase of a two-part "hit-grab" sequence (aligning with its last frame for seamless transition); and designed the second phase as *the original lift-and-launch animation at issue*, replacing the now-removed Psycho Crusher in V-Trigger 2. This consolidated M. Bison's V-Trigger 2 into a pure "Psycho Mine V-Trigger," while enhancing M. Bison's immediate base access to Psycho Crusher for better character identity and playability.

7. On April 29, 2021, Plaintiff publicly displayed a game demonstration video on X featuring these enhancements to M. Bison, including the original animation (**Exhibit C (Plaintiff's original video): https://m.youtube.com/watch?v=4MdD-LwdOd4**). The video begins by aligning with the last frame of Defendants' SF5 M. Bison's V-Shift Break animation (repurposed by Plaintiff as the "hit" phase of the sequence). The full "hit-grab" animation sequence continues into an original animation sequence by Plaintiff with M. Bison lifting the

opponent character single-handedly by the opponent's abdomen with one arm, while vigorously pumping his other arm, before explosively launching the opponent upward into the air above M. Bison. This leads directly into an advantageous gameplay combat scenario for M. Bison to immediately follow with an extra combo attack opportunity. This sequence is original expression: specific frame timing (similar amount of time between the beginning and end of the sequence), single-handed grasping hand positioning on the abdomen, lift motion with arm pumping, and throwing opponent upward (incorporating Psycho Mine behavior for the explosive launching upward toss, a specific attribution by Plaintiff predating any similar use by Defendants). (See Exhibit L for mechanics overview.) The work was first made public on April 29, 2021, via X (**URL: <ins>https://x.com/realguy001no/status/ 1387689304634261505?s=46</ins>**).

8. The *Street Fighter* video game franchise and the character M. Bison, developed and published by Defendants, spans 33 years (1991–2024) and appears in no less than 31 official games, with extensive multimedia extensions including toys, apparel, comics, cartoons, and films (full chronology in Exhibit H; multimedia legacy timeline in Exhibit K). Defendants meticulously preserve the visual identities of their *Street Fighter* characters—including M. Bison (known as Vega in Japan), the series' iconic dictator antagonist who debuted as the final boss in *Street Fighter II: The World Warrior* (1991)—through consistent depictions of distinctive appearances (e.g., M. Bison's red military uniform, flowing cape, glowing Psycho Power aura) and signature "special moves" (e.g., Psycho Crusher, Double Knee Press, Devil's Reverse). This deliberate consistency fosters deep consumer loyalty and transforms archetypal fighters into richly protectable expressions under copyright law, where commercial exploitation and narrative depth elevate designs beyond mere ideas. In this 33-

year canon—and prior to Plaintiff's April 2021 publication—no prior depiction features M. Bison's single-handed abdomen lift with explosive upward launch, rendering such innovations rare, traceable, and non-random.

9. In July–August 2021, Plaintiff emailed Defendants pitching a potential product for collaboration on upgrades, directing the emails to recruit@capcom.com, a Japanese Capcom email address affiliated with Defendant Capcom Co., Ltd., the entity responsible for the game's actual development and design (Exhibit G: Correspondance records; p.1–4). Plaintiff believed this solicitation targeted the explicit interest of Defendant Capcom Co., Ltd. as the game's developers. The email shared a demonstration video featuring enhancements hosted on Plaintiff's YouTube channel, which contains a link to Plaintiff's Discord channel used to share additional development videos. Although Plaintiff's X handle is not in that specific video's description, another video on the same YouTube channel explicitly links to Plaintiff's X account (@Realguy001No). This creates deliberate multi-level chains of access: (1) from the email to Defendant Capcom Co., Ltd., (2) to the shared YouTube video, (3) to the linked Discord channel in the video description, (4) to a subchannel on the Discord channel with further development videos, (5) to scrolling and seeking through past posts in the subchannel, (6) to reach and discover the M. Bison demonstration video; or alternatively (1) from the email to Defendant Capcom Co., Ltd., (2) to the shared YouTube video, (3) to the YouTube channel, (4) to another video on the YouTube channel linking the X handle, (5) to the X account, (6) to scrolling and seeking through multiple months (February–August 2021) or even years (if reviewed retroactively in 2024) of Plaintiff's past development posts on X, (7) to reach and discover the April 29 2021 animation. The multiple successive steps necessary to gain access to Plaintiff's animation prove intent to access. These posted demonstration

videos on X are indirectly accessible via a hyperlink in Plaintiff's pitch emails to Defendants, including the shared YouTube video (which hyperlinked to Plaintiff's Discord channel for additional development videos) and other videos on the same YouTube channel (which explicitly hyperlinked to Plaintiff's X account), providing multiple multi-level chains of access necessary to have viewed the animation sequence. The pitch emails implied Plaintiff's use of third-party tools otherwise necessary to access and modify compressed SF5 game files and folders, enabling the creation and demonstration of these enhancements. Defendants rejected the email pitch without further communication, raising no objections to the disclosed modifications. After the initial email correspondence ended in August 2021, Plaintiff personally decided on a development hiatus for the project, otherwise abandoning continued development, and was no longer engaged in meaningful communications about the pitched project with Defendants.

10. Plaintiff's modifications to SF5, including the creation of new animations and gameplay mechanics for personal portfolio development and pitching to Defendants, constitute fair use under 17 U.S.C. § 107. These transformative works add original expression—such as the novel hit-grab sequence and character-specific enhancements—without substituting for the original market of SF5, as they are limited to private experimentation, public demonstration for community gauging, and good-faith collaboration proposals. Such modding aligns with established fair use precedents for artistic alterations that critique, comment on, or expand upon the source material in non-commercial contexts, particularly where the developer (here, Defendants) has tolerated community modding for SF5 without enforcement actions against similar disclosures.

11. On June 8, 2024, Plaintiff discovered that Defendants had revealed M. Bison as downloadable content DLC for *Street Fighter 6* (Year 2 Pass; not part of the initial 2023 launch roster, Year 1 Pass, or any 2023 content), with the release occurring on June 26, 2024. In this DLC, Defendants incorporate Plaintiff's animation into M. Bison's Overdrive Psycho Crusher variant (after setting a Psycho Mine via Backfist Combo): At the move's end, M. Bison drives an open-handed grasp into the opponent's abdomen, lifts them single-handedly by the abdomen with one arm while vigorously pumping his other arm, and detonates the Psycho Mine to explosively launch the opponent upward into the air above M. Bison for a juggle state of follow-up combos (**Exhibit E (Defendants' video): <https://m.youtube.com/watch?v=lXZsFYkwg24>**). This is virtually identical in expressive elements (single-handed abdomen clasping lift with arm pumping, Psycho burst launch utilizing Psycho Mine behavior) and also gameplay utility (post-launcher combo follow-up extension), despite minor differences (e.g., Defendants' animation facing direction toward opponent and away from camera vs. Plaintiff's facing toward camera). **Exhibit A (frame-by-frame focus): <https://m.youtube.com/watch?v=eHKpSYT5DhQ>** .

12. The near-identity of multiple expressive elements from Defendants' utility of the animation—[A] specifically the character M. Bison (rather than any other *Street Fighter* character) executing [B] the single-handed abdomen-grasping lift with vigorous arm pump animation (which Plaintiff imagined, invented, and originally intentionally designed for M. Bison), before [C] detonating a Psycho Mine (rather than any other available or newly designed visual effect) for [D] an explosive upward launch (rather than any other hit effect, e.g., knockback, knockdown, side-switch, off-the-ground bounce, or off-the-wall bounce) into [E] a juggle state enabling follow-up combos (rather than an end of combo)—mimics Plaintiff's

original 2021 design and novel implementation so specifically as to compel an inference of deliberate plagiarism, more than merely proving access and copying. **Exhibit A (side-by-side comparison): https://m.youtube.com/watch?v=AxSrIDdX4sQ** . Minor variances (e.g., camera angle) are hallmarks of adaptation, not independent expression, especially post-Defendants' 2021 access via rejected pitch (Exhibit G). Differences seem superficial while retaining the total concept and feel of the appearance, animation, and function of the designed special move and the gameplay utility for it (See Exhibit L for mechanics overview.) Plaintiff makes no claim on being the originator of M. Bison, Psycho Mines, Psycho Power aura special effects, Psycho Crusher, V-Trigger, V-Shift Break, launchers, juggles, or other individual game design mechanics and gameplay visuals displayed by Defendants in their games *Street Fighter V* or *Street Fighter 6,* sans infringing animation. Plaintiff merely finds the substantial similarity for the [A][B][C][D][E] consecutive step-by-step sequence of appropriation to get from Plaintiff's personally designed move for M. Bison in *Street Fighter V*, to a presumptuously unrelated and somehow original sequence following the same exact [A][B][C][D][E] structure from Defendants in *Street Fighter 6*, to be implausible absent access and copying. Plaintiff points out the striking similarities of the entire sequenced structure of appearance and special-move gameplay mechanics only for the purpose of validating the claim against Defendants showing willful access to (and willful copying of) Plaintiff's original copyrighted animation nestled amongst the entire copied sequence.

13. Since discovering the infringement in 2024, Plaintiff had attempted to contact Defendants over this matter through the remainder of 2024 and into 2025 via multiple emails, all of which had been ignored and avoided, short of an initial reply from Defendants claiming their game concepts were created by their own development staff with refusal for further

communication about the matter. Plaintiff also attempted to establish communication in 2025 via phone using the two contact numbers posted on Defendants' USA website; however, one number was disconnected, and the other only hosted an automated message directing inquiries to email without any options to connect to a representative or leave a message for callback. These unsuccessful efforts forced Plaintiff to seek this lawsuit as the only form of action possible and reasonable to pursue restitution. See Exhibit G: p.5–16 (Correspondence Records).

14. The work was first published on April 29, 2021, via X video (URL: https://video.twimg.com/ext_tw_video/1387689216746786816/pu/vid/480x270/nZtLRwU1eLYvwgHR.mp4). Plaintiff filed U.S. Copyright Office Registration No. PAu 4-280-291 on June 28, 2025, claiming the work as a derivative audiovisual animation first published April 29, 2021. Registration was decided approved for certification after correspondance with the Copyright Office on December 3, 2025; sufficient for suit under 17 U.S.C. § 411. See Exhibit B.

15. On November 10, 2025; Defendants were contacted by Plaintiff via emails to privacy@capcom.com and privacyinfo@capcom.com, where Plaintiff extended a serious intent to sue with inclusion of a draft of this complaint alongside a goodwill narrative of offering a pre-suit settlement potential for payment and attribution and a 60-day window out towards January 9, 2026 for a potential agreement to be made. On November 19, 2025; Defendants were again contacted at support@capcom.com, where Plaintiff received an automated email reply which could suffice as receipt, not initially present (and therefore ambiguous as to whether the contact emails were received) in the first contact to Defendants' "privacy" and "privacyinfo" email addresses. On December 16, 2025; Defendants were

contacted at legal@capcom.com to open a line of discussion about this matter. On December 24, 2025; Defendants were once again contacted to remind of the upcoming deadline. Plaintiff was able to confirm beyond a reasonable doubt that the legal@capcom.com address was a real address owned and operated by Defendants (alongside support, privacy, and privacyinfo), despite no prior publicity, by cc'ing multiple differently named guesses with the @capcom.com address, all of which bounced and were reported back by the mailer daemon as not emails which could be delivered to; all except legal@capcom.com, guaranteeing that Defendants own and operate such an address. Defendants were notified, and given precursory context to potentially expect a defense because of their awareness of a draft of this complaint which Plaintiff shared with Defendants, which had been provided on the case of Plaintiff offering a pre-suit settlement with upfront honesty about the whole, obvious nature of the copied work and potential lawsuit; Plaintiff offering Defendants an option to correct the situation without the necessity of a lawsuit. On January 8, 2026 (Exhibit G: p.17); A legal representative for Defendant Capcom Co. Ltd. responded to the emails notifying Plaintiff of Defendants' direct awareness of the previous dated emails, however Plaintiff and Defendant Capcom Co. Ltd. did not come to an adequate resolution for the pre-suit settlement offer as Defendant believed their development staff did not copy Plaintiff's work because Defendants use motion capture technology to make their own game animations; different than Plaintiff's animation method of hand-manipulated mouse-cursor software-based design..

16. Defendants had access via the 2021 pitch chain to recruit@capcom.com and public X post. The striking similarity in protected expression (not mere ideas)—unprecedented in Defendants' 33-year multimedia canon (Exhibits H & K)—coupled with this deliberate access chain (Para. 9) and lack of independent creation evidence, establishes a reasonable

inference of unauthorized copying. Given the proximate timeline, pitch rejection, and Defendants' own historical struggles to protect similar designs in the early 1990s as in *Capcom U.S.A. Inc. v. Data East Corp.* (the early years of the *Street Fighter* franchise when merchandising and commercial depth was nascent ; Exhibit K), a potential lingering belief in the impunity of "borrowing" franchise elements is revealed—ironically, the very doubt that once plagued Defendants as plaintiff v. Data East—likely emboldened the direct copying from Plaintiff's exposed animation work, programmed for the same character, and in identical gameplay context. However, unlike *Capcom U.S.A. Inc. v. Data East Corp.*, where the motions and movements of the fighters were identified as humanly relatable generalized martial arts prose, Plaintiff's animation is instead specific in design of a fantasy-esque strength (lifting another man high off the ground by a single hand on his abdomen) outside normal humanly possible ability, nor representing as a standard martial arts combat tactic. Infringement is willful, as Defendants rejected Plaintiff's pitch yet used the work three years later, deriving from exposure to Plaintiff's 2021 animation, which predates Defendants' M. Bison's *Street Fighter 6* inclusion by over three years. Defendants find value in Plaintiff's proposed work and copied it with the intent of profitably enhancing the value of *Street Fighter 6*, their character M. Bison, and the *Street Fighter* franchise at large. Defendants reproduce, distribute, publicly display, and derive value from the infringing animation in *Street Fighter 6* DLC (sold worldwide via Steam/others), causing Plaintiff harm including lost licensing opportunity and/or employment compensation. Defendant Capcom Co. Ltd. claiming to motion capture and self-design their own animations via their game development staff and motion capture artists, supports enhanced damages and recovery via Defendants' being held vicariously liable for any such employee that had seemed to engage in the obvious plagiarism against Plaintiff. Defendants' initial refusal to engage further (non-responsiveness

despite awareness throughout 2024–2025) evidences willful blindness/avoidance (e.g., *Erickson Prods., Inc. v. Kast*, 921 F.3d 822 (9th Cir. 2019); *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995 (S.D. Tex. 2000)), supporting enhanced damages.

17. This action is brought in good faith, based on a thorough investigation including side-by-side comparisons (Exhibit A), historical review of Defendants' M. Bison depictions showing unprecedented novelty (Para. 8), and documented access via the 2021 pitch chain (Para. 9). Plaintiff asserts no baseless or harassing claims, but seeks legitimate enforcement of exclusive rights under 17 U.S.C. § 106, consistent with Nevada's protections against bad-faith assertions via NRS 598; further fueled by the emotional and psychological burden which Plaintiff experienced by rejection from Defendants' through multiple successive scenarios: (1)Rejection of the original pitch, (2)Discovery of Defendants' copying despite original rejection, (3)Defendants' claims of proprietary and original design over Plaintiff's work, (4)Defendants' refusal for further communication about the context, (5)Defendants' willful avoidance and ignorance of reasonable offers for payments and attributions for over a year, (6)Ultimately realizing to Plaintiff's burden of involvement to research, learn about, understand, and deploy this legal recourse simply to defend Plaintiff's rights as an individual, as primarily the individual that Plaintiff had ever been in his own creative and original animation expressions; that the infringement is more than a simple case of copied work, but also that Defendants' had engaged in an unreasonable procession avoiding normalcy by rejecting Plaintiff's proposals while seemingly understanding full well the value of what Plaintiff was offering, needlessly having stolen Plaintiff's work behind Plaintiff's back to avoid either hiring Plaintiff directly or collaboratively licensing Plaintiff's work.

**DAMAGES**

18. Plaintiff seeks Defendants' profits and actual damages under 17 U.S.C. § 504(b), apportioned pro-rata to the infringing animation (1 of M. Bison's 71 combat moves; 1 of ~2,100 roster-wide via approximating 70–80 avg. ~75 moves per character for 28 characters as of November 25, 2025 and Defendants' completion of their *Year 2* game edition roster update featuring M. Bison; apportioned further to ongoing sales and game edition updates for more characters, e.g., 1 of ~2,250 by completion of *Year 3*, 30 characters: subject to Defendants' records and exact number of combat moves). Apportionment aims to sever infringing elements reasonably. Defendants' *Street Fighter 6* game is updated for each consumer-owner having purchased the game; to be granted viewable access to any DLC additional content for the purpose of multiplayer game compatibility between each owner of *Street Fighter 6*; thus, every *Street Fighter 6* unit infringes by being updated to be capable of displaying the infringing content, even if the owner does not purchase the M. Bison DLC. As Defendants make in part *having a value for the implementation of the infringing content in Street Fighter 6*, whether Defendants did not charge money to merely view the content via automatic game compatibility updates between all owners of *Street Fighter 6*, does not egress Plaintiff's copyright protections guaranteeing Plaintiff the right to determine where, when, and for how much Plaintiff's work is distributed and displayed. Plaintiff seeks defined pro rata apportionment for the infringing content across all present and future *Street Fighter 6* base game sales which have continued or could continue to display the copyrighted animation. DLC sales featuring M. Bison directly profit in part from the animation. *Street Fighter 6* Game Edition bundles including M. Bison (e.g., *Street Fighter 6 Years 1-2 Fighters Edition*) directly profit in part from the animation. As of November 20, 2025, 6 million *Street Fighter 6* units have been sold worldwide (https://x.com/streetfighter/status/1991642877999366419);

~1.8 million post-June 2024 (M. Bison release). Exact DLC figures require discovery of Defendants' sales records (e.g., Steam/Sony Store for PlayStation 4/Sony Store for PlayStation 5/Microsoft Store for Xbox Series S/Microsoft Store for Xbox Series X/Nintendo eShop Store for Switch 2 reports).

19. Defendants' profits: Conservative calculation (using public data as of November 2025 and 5~10% SF6 owners further purchasing DLC; estimates): Base game revenue reflects infringement via universal updates enabling display/compatibility (Para. 18), apportioned separately from DLC's direct character sales to avoid overlap. A ruling in Defendant's favor—or any dismissal that permits Defendant to retain full credit and profits from the unauthorized incorporation of Plaintiff's original animation sequence—would set a dangerous precedent in the animation and video game industries, encouraging blatant copying of independently created expressive works, defendable merely on the basis that such sequences are displayed publicly or reducible to generic human capabilities (e.g., "anyone can imagine and animate a character performing a unique motion, therefore the ideas behind original expression should not be protected"). This would effectively nullify copyright protection for animation sequences, contrary to the fundamental principles of 17 U.S.C. § 102(a), which expressly protects original works of authorship fixed in tangible form, including pictorial, graphic, and sculptural works encompassing motion and expression. Such an outcome would not only deprive individual creators like Plaintiff of the fruits of their labor but also discourage innovation and individualism in artistic expression—the very progress the Copyright Clause (U.S. Const. art. I, § 8, cl. 8) and the Copyright Act seek to promote; further deriding against the concepts of seniority and legacy of *any* importantly valued construct in having any growth potential of continued positive evaluation accumulation by

the mere function of the passage of time or attempts to secure that artistic ideas be held with regard. By unfairly enriching a large corporation like Defendant at the expense of an independent artist—who originally shared their work in good faith, implicitly contingent on contemplating potential collaboration or employment which could have originally mutually enriched all parties involved— the Court would undermine the incentives for creators to develop and share novel works or pitch prospective views to established companies, fundamentally invalidating copyright law while also negating assistive supportive creativity or mutual consideration to recognize established brands and their branding marketing. Plaintiff respectfully submits that disgorgement of attributable profits is essential to deter such conduct and preserve the integrity of marketable value and copyright law for animators and artists.

(a) Infringer's Profits Attributable to the Infringement: Pursuant to 17 U.S.C. § 504(b), Plaintiff seeks recovery of actual damages suffered as a result of the infringement, together with disgorgement of Defendant Capcom's profits attributable to the unauthorized use of Plaintiff's copyrighted animation sequence in M. Bison's Overdrive Psycho Crusher special move in *Street Fighter 6*. As announced by Defendants on their official X account for the *Street Fighter* brand, *Street Fighter 6* has sold over 6 million units worldwide as of November 2025. The primary commercial value of *Street Fighter 6* derives from its competitive versus gameplay, where two player-selected characters engage in combat using unique combat style movesets (see Exhibit P). This core loop—evidenced by the game's design, community emphasis on human-versus-human play, and Defendant's investment in Capcom Cup esports tournaments—accounts for the vast majority of player awareness and engagement for the *Street Fighter* franchise, with auxiliary modes (e.g., World Tour) constituting a minor fraction. As of December 2025, *Street Fighter 6*'s game roster comprises

28 characters, each with approximately 75 combat moves (normals, specials, Supers, etc.), totaling ~2,100 moves across all characters. The infringing animation, one of M. Bison's 71 moves, represents a baseline pro rata share of 1/2,100 of the game's marketable value via animated combat content. However, as a "*special move*", its contribution is significantly greater. Special moves uniquely attributable to their paired character, such as Ryu's Hadouken (Exhibit P), are iconic, merchandisable elements central to the franchise's branding and marketing, as distinguished in precedent context and contest over such the matter in *Capcom v. Data East*. Each character averages ~14 special moves (including Supers), totaling ~392 special moves across the 28 character roster, yielding a pro rata share of 1/392 for the infringing animation. Pending discovery into Defendant's exact revenue (from game sales, DLC, esports, and merchandising), Plaintiff estimates profits attributable to the infringement at $114,000–$142,000 (1/2,100 of ~$240–300 million gross revenue) or, more accurately, $612.000–$765,000 (1/392, reflecting the special move's elevated value). Defendant bears the burden of proving any non-attributable profits. Plaintiff further seeks prejudgment interest and costs.

(b) Individual M. Bison DLC sales × $7 (equivalent dollar value via Defendants' *Fighter Coins* game currency, where M. Bison is individually purchasable for *350 Fighter Coins*) × (1/71) ≈ $20,000, or × (1/14) ≈ $101,000 when considering heightened evaluation as a special move;

(c) Year 2 Character Pass sales × $29.99 × (1/235) [4 characters' total moves] ≈ $38,000 , or × (1/56) [4 characters' total special moves] ≈ $159,000;

(d) Year 2 Ultimate Pass sales × $49.99 × (1/235) ≈ $32,000, or × (1/56) ≈ $134,000;

(e) Ongoing/future: New editions (e.g., *Years 1-3 Fighters Edition* × price × (1/2,250 [30 chars × 75] or 1/420 [30 × 14 special moves]) × pro-rata;

Lowball profits total: No less than $204,000 when considered as a combat motion at 1/2100, up to $1,159,000 when considered for the elevated merchandisable heightened value as a character-identifiable "special move" at 1/392 (apportioned aggregate; exacts via discovery). Plaintiff estimates conservatively; totals may exceed via Defendants' records.

20. Actual damages: Had Defendants accepted Plaintiff's original 2021 collaboration pitch, a reasonable licensing fee for the delivery of Plaintiff's sum cumulative total works of additional animations and gameplay adjustments across all characters could have been $200,000 (potential agreement); alternatively, had Defendants hired Plaintiff post-2021 pitch (as gauged via the mod portfolio), Plaintiff would have earned approximately $200,000 over 3 years (2021–2024) developing similar animations, including this one, at prevailing mid-level animator rates within the game industry ($66,000/year, based on IGDA Developer Satisfaction Survey 2023 and Glassdoor 2025 data). See Exhibit O.

21. Willful infringement (via 2021–2024 access) supports enhanced recovery under federal law. Alternatively, as a one-time reasonable fee in lieu of actuals and ongoing payments per apportioned profit royalties presently and extending into the future use of the animation for further Defendants productions, Plaintiff seeks $850,000.

**FIRST CAUSE OF ACTION: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)**

22. Plaintiff restates and incorporates paragraphs 1–21.

23. Plaintiff owns valid copyright in the April 29, 2021 animation.

24. Defendants violate Plaintiff's exclusive rights under 17 U.S.C. § 106 by copying, reproducing, distributing, and displaying the work in *Street Fighter 6* without authorization, including derivative works like updates, ports, and merchandise featuring the animation.

**PRAYER FOR RELIEF**

Plaintiff requests:

(a) A declaration that Defendants infringed Plaintiff's copyright;

(b) Permanent injunction under 17 U.S.C. § 502 prohibiting further use/distribution/display unless licensed or authorized, or alternatively, court-supervised licensing at pro-rata royalties;

(c) The total of actual damages and Defendants' apportioned profits under 17 U.S.C. § 504(b), per Paragraphs 18–21: $404,000–$1,359,000 ($204,000–$1,159,000 profits + $200,000 actuals), or alternatively $850,000;

(d) Costs of suit, including filing/service/discovery fees;

(e) Reimbursement for reasonable attorney fees if acquired post filing under 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d);

(f) Declaratory judgment under 28 U.S.C. § 2201 that Defendants are equitably estopped from asserting any claims for breach of EULA/terms of service or DMCA violations arising from Plaintiff's 2021 *Street Fighter V* modifications (as disclosed in the August 2021 pitch emails, Exhibit G)—specifically, Plaintiff's use of third-party "street fighter modding community" tools to gain uncompressed access to compressed installation game files and folders, enabling the production and display of the enhancement modifications—due to Defendants' silence and failure to provide notice despite awareness and access via the 2021 emails, amounting to acquiescence that induced Plaintiff's reasonable reliance: (1) via self-advertisement of the modified game files in the 2021 pitch; (2) leading to Plaintiff's 2024 discovery of the

animation infringement; and (3) culminating in this good-faith action over Plaintiff's copyrighted animation as a last resort, further disclosing the modifications to which Defendants have raised no objection despite ample opportunity since 2021; moreover, such modifications qualify as fair use under 17 U.S.C. § 107, being transformative, non-commercial, and non-market-substituting, thereby providing an independent defense against any retroactive EULA or DMCA claims by Defendants;

(g) Such other relief as the Court deems just, including expedited discovery of sales/DLC data, ongoing royalty monitoring, a declaration affirming the good-faith nature of this action under NRS 598, and prejudgment interest at the federal rate.

Dated: January 26, 2026

Respectfully submitted,

*Fraser Bushnik*

Fraser Bushnik, pro se
7569 Gold Dr., Reno, Nevada, 89506
775-530-9109
fraser.bushnik@gmail.com
ichibanfridge@gmail.com

## Exhibits as filed: January 26, 2026

Exhibit A: Frame-by-frame focus :: **https://m.youtube.com/watch?v=eHKpSYT5DhQ**

Exhibit A: Side-by-side comparison :: **https://m.youtube.com/watch?v=AxSrIDdX4sQ**

Exhibit B: Copyright Registration :: **https://api.publicrecords.copyright.gov/search_service_external/copyrights/pdf?copyright_number=PAu004280291**

Exhibit C: Video of public display on Twitter/X :: **https://m.youtube.com/watch?v=4MdD-LwdOd4**

Exhibit C: Original Twitter/X post :: **https://x.com/realguy001no/status/1387689304634261505?s=46**

Exhibit C: Internet Archive backup of the Original Twitter post :: **https://web.archive.org/web/20210429084508/twitter.com/realguy001no/status/1387689304634261505**

Exhibit D: Upload date and video description of original video shared to Defendants.

Exhibit E: A clip from Defendants' advertisement video for M. Bison in *Street Fighter 6* :: **https://m.youtube.com/watch?v=lXZsFYkwg24**

Exhibit E: Defendants' original advertisement video :: **https://m.youtube.com/watch?v=5dgfrWteSW0**

Exhibit G: E-mail correspondance records between Plaintiff and Defendants' various addresses.

Exhibit H: Chronology of M.Bison depictions in official video games published by Defendants.

Exhibit K: Street Fighter Multimedia Branding Timeline.

Exhibit L: Glossary of terms relevant to the game design of Defendants' products.

Exhibit O: Glassdoor search results and IGDA survey supporting claims of salaries within the game development industry.

Exhibit P: Screenshots of in-game Street Fighter characters performing special moves, and photos of merchandise providing the awareness of the value of branding and merchandising (both licensed and official) for Street Fighter characters and their special moves.

Pictorial and infographic exhibits follow